**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Case No.  1:07CR360** |
| | : | |
| **Plaintiff(s),** | : | **JUDGE O'MALLEY** |
| | : | |
| **v.** | : | <u>**ORDER**</u> |
| | : | |
| **JOSELIN CASTRO,** | : | |
| | : | |
| **Defendant(s).** | : | |

Before the Court is Defendant Joselin Castro's ("Castro" or "Defendant") October 30, 2007 *Motion to Suppress Evidence* (Doc. 15).  In his *Motion to Suppress*, Castro seeks to suppress evidence discovered, and statements made, during a traffic stop and, later, at his residence.  The United States of America (the "government") filed a Response in Opposition on November 7, 2007 (Doc. 17).

The Court held a hearing on the Motion to Suppress on November 29, 2007.  During the hearing, one of the Defendant's witnesses failed to appear and it became clear that the Defendant required additional time to investigate the possibility that some of the events at issue were recorded by law enforcement, and to procure those recordings.  Accordingly, the Court adjourned the proceeding to allow the Defendant additional time to better present his position and invited the parties to submit supplemental briefs.  On January 8, 2008 the Defendant filed a *Supplemental Brief in Support of His Motion to Suppress* (Doc. 25).  The government filed its Response to the Defendant's brief on January 11, 2008.  Later on January 11, 2008, the Court reconvened the suppression hearing.  Despite numerous requests from the Court and the parties, both formal and informal, for rough or final transcripts of the reconvened suppression hearing, the final transcript of the hearing was not filed until March 3, 2008.  On March 4, 2008 after much consideration and a careful reexamination of some key

testimony offered during the suppression hearings, the Court **DENIED** Castro's Motion to Suppress (Doc. 15) and informed the parties that it would provide a written opinion to explain more fully its reasoning. [1]

I.      **BACKGROUND**.

According to Cleveland Police Department ("CPD") Detective Maria Matos ("Detective Matos"), about four months before the May 22, 2007 arrest and search of Castro and his residence, she received an anonymous telephone call informing her of Castro's activities. Detective Matos testified that the anonymous caller informed her that Castro and other members of his family were dealing heroin out of their residence. Detective Matos stated that the caller provided her with Castro's address (2180 West 83rd Street, Cleveland, Ohio, hereinafter the "Castro residence") and a description of the vehicles Castro often would drive. As a result of this tip, Detective Matos testified that she began to conduct informal surveillance of the Castro residence by periodically monitoring the house. During the course of her informal surveillance, Matos observed an unusually high amount of traffic in and out of the Castro residence.

On May 22, 2007, Detective Matos testified that the CPD was targeting Castro's neighborhood for enforcement because it was known to be a "hot spot" – an area in which a high concentration of illegal, drug-related activity took place. At approximately 1:00 p.m. Detective Matos, operating undercover, approached the Castro residence in her unmarked vehicle. She testified that she observed a gray Toyota station wagon ("Castro's vehicle") illegally parked (facing against traffic) on the side of the street in front of the Castro residence. Detective Matos stated that she observed Castro and a white male enter the illegally parked vehicle. According to Detective Matos, the white male

_____

[1]      Subsequent to the Court's oral ruling, Castro entered a conditional plea by which he preserved his right to appeal from this ruling.

2

started the car and drove it into Castro's driveway, driving initially on the wrong side of the street in order to do so.  According to Detective Matos, at that time she contacted CPD Sergeant Kevin Kelly ("Sergeant Kelly"), and advised him of the traffic violation.  Detective Matos then observed Castro exit the car, briefly enter the residence, and return to the car.  Once Castro returned to the car, the driver backed out of the driveway and departed the residence.  Detective Matos followed Castro's vehicle, broadcasting its location so that officers in a marked vehicle could initiate a traffic stop.

At the suppression hearing, Sergeant Kelly testified that Detective Matos informed him that she observed the gray Toyota station wagon committing a traffic violation and asked him to stop the vehicle.[2]  According to Sergeant Kelly, once he observed the vehicle, he and Detective Fallon stopped it with the assistance of the zone car.[3]

Once the vehicle was stopped, Sergeant Kelly approached it to ask the driver for his license.  Sergeant Kelly determined that the driver of the vehicle did not have a valid license, and asked him to step out of the vehicle so he could be arrested for driving under a suspended license.  When the driver exited the vehicle, Sergeant Kelly testified that he observed a small piece of folded paper on the floor of the car with what appeared to be narcotics spilling out of it.  Sergeant Kelly advised Detective Fallon, who was on the passenger's side of the car, that he found drugs.  According to Kelly, at that time Detective Fallon removed Castro from the vehicle and, in the process of removing Castro, discovered a second piece of folded paper on the floor of the vehicle that also appeared to contain narcotics.  This discovery prompted Detective Fallon to conduct a pat down of Castro's person, during

---

[2]     Detective Matos did not want to effectuate the traffic stop because she was concerned with her undercover status.  She explained that this concern is what prompted her to call a marked patrol car.

[3]     Sergeant Kelly and Detective Fallon were travelling in a detective car.  The zone car, apparently, is the "black and white" marked CPD cruiser in the vicinity.

which he discovered a bag of heroin.  As a result, Castro was placed under arrest, advised of his rights, and placed in the marked police car.

Sergeant Kelly further testified that, immediately after Castro's arrest, he contacted Detective Matos and advised her that they had found narcotics during the traffic stop.  Detective Matos and Sergeant Kelly then decided to call Jennifer Driscoll ("Driscoll") at the Cuyahoga County Prosecutor's office, advise her of the investigation and arrest of Castro, and seek a warrant to search Castro's residence.  According to Detective Matos, Driscoll informed them that they had enough information to obtain a search warrant, and advised Detective Matos to meet with her to begin preparing the documents necessary for the warrant.  Detective Matos testified that she went to the prosecutor's office, met with Driscoll, and that Driscoll generated a warrant and an affidavit.  Detective Matos stated that she signed the affidavit in front of the judge, and that everything in the affidavit was true.

While Detective Matos was in the process of securing a warrant, Sergeant Kelly and other members of the vice squad returned to Castro's residence to secure the premises.  According to Sergeant Kelly, once they arrived at the residence, the CPD officers approached the home with their guns drawn and saw some movement through the curtains.  Sergeant Kelly testified that he knocked on the rear door of Castro's residence and was greeted by Castro's mother.  Sergeant Kelly said that he told Castro's mother that the police were at the home in connection with a drug investigation.  Sergeant Kelly said that Castro's mother allowed them to enter the home, but he did not remember the substance of any conversation he may have had while seeking permission to enter.  Once Sergeant

4

Kelly was in the home, he noticed a scale on the dining room table.  He then proceeded to conduct a protective sweep of the home, during which he discovered a rifle in a closet.[4]

As soon as the warrant was signed by the judge, Detective Matos contacted Sergeant Kelly, who was already at the Castro residence, and told him that the warrant was signed.  Detective Matos testified that she then went to the Castro residence to meet with Sergeant Kelly and conduct a search of the house.  The search of Castro's residence revealed weapons, ammunition, additional quantities of heroin, and scales.

## II.  DISCUSSION.

The Defendant raises several issues with respect to his arrest and the search of his residence. Castro's challenges fall into the following groups:  (1) there was no probable cause to initiate a traffic stop of his vehicle; (2) the "protective search" of his residence was improper; and (3) the search warrant was not supported by probable cause.

### A.  There Was Probable Cause to Initiate a Traffic Stop of Castro's Vehicle.

The Sixth Circuit has held that: "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment."  United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993).  If probable cause existed, moreover, a stop does not violate the Fourth Amendment even if it is based on other motivations.  Id.  The Court, therefore, must determine only whether Sergeant Kelly had probable cause to initiate the traffic stop Castro's vehicle.

---

[4]      The presence of a scale on the dining room table is a fact included in the affidavit supporting probable cause to issue the search warrant.  Thus, at some point after he entered the home, Sergeant Kelly must have contacted Detective Matos and notified her of the presence of the scale.  The firearm found during the protective sweep, however, was not included in the affidavit.

Detective Matos, who has been a police officer for eighteen years, testified that she personally observed Castro's vehicle commit a traffic violation by driving on the wrong side of the road, after having been parked facing against traffic (*i.e.*, facing in the wrong direction). Detective Matos testified that she notified members of her unit (including Sergeant Kelly) of the traffic violation, and instructed them to initiate a traffic stop of Castro's vehicle. (Nov. 29, 2007 Suppression Hr'g, at 15:3-15:9). Sergeant Kelly also testified that Detective Matos notified him that Castro's vehicle committed a traffic violation, and that Detective Matos asked for assistance in stopping the vehicle. (Id., at 37:23-38:2) Generally, a police officer's observations are adequate to establish probable cause. See United States v. Fleenor, No. 05-6444, 2007 WL 30785, at *2 (6th Cir. Jan. 4, 2007). It is not problematic that Sergeant Kelly did not observe the traffic violation himself. Collins v. Nagle, 892 F.2d 489, 495 (6th Cir. 1989) (stating, "probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest.").

Castro challenges the legitimacy of the traffic stop by asserting that: (1) the driver did not commit a traffic violation; and (2) Detective Matos's testimony is insufficient to show that Sergeant Kelly had probable cause to believe that a traffic violation occurred. In essence, Castro argues that Detective Matos neither observed a traffic violation, nor reported a traffic violation to Sergeant Kelly. In the face of contrary testimony from two law enforcement officers, such a claim often falls flat. Here, however, Castro's position is bolstered by the remarks made by Detective Matos over the CPD's TAC-1 police channel, which were contemporaneously recorded by the CPD.

The TAC-1 recording begins with Detective Matos broadcasting Castro's vehicle's direction of travel. Once the other officers appear to be nearing Castro's vehicle, Detective Matos says, "the target is the passenger, do a traffic stop on 'em, white male driver . . . . And it's, uh, heroin I'm

6

looking for Mike if you're going to stop them, and then the passenger is the target." (Jan. 11, 2008 Suppression Hr'g, CD Recording of TAC-1 Channel, Def.'s Supplemental Ex. 1)  There is no discussion of a traffic violation over the TAC-1 channel.  (Id.)

Castro argues that this portion of the tape shows that Detective Matos never informed Sergeant Kelly of the traffic violation.  Instead, according to Castro, the TAC-1 tape reveals that the traffic stop was initiated without probable cause for the sole purpose of improperly investigating whether Castro possessed heroin.  As noted above, in her testimony before the Court, Detective Matos stated that she notified other officers of the traffic violation, and then proceeded to follow Castro's vehicle and broadcast its whereabouts in anticipation of the traffic stop.  (Nov. 29, 2007 Suppression Hr'g, at 15:3-15:9).  Castro contends that Detective Matos's account of the traffic stop in her testimony is at odds with the TAC-1 recording because the TAC-1 tape begins with Detective Matos's description of the movements of Castro's vehicle and contains no discussion of the traffic violation.  Castro argues that, because the only evidence before the Court relating to the traffic violation is Detective Matos's testimony that she observed the violation and reported it to other officers, and because this is at odds with the only objective evidence, the TAC-1 tape, her testimony cannot be credited.  Thus, Castro submits that there is insufficient evidence to support a finding that Sergeant Kelly had probable cause to conduct the traffic stop.

During the reconvened suppression hearing, Detective Matos was recalled to the witness stand.  In her subsequent examination, while Detective Matos conceded that she suspected Castro of dealing heroin and hoped to find evidence to support that suspicion during the traffic stop, her suspicions were not what prompted the stop; it was the fortuity of witnessing the traffic violation

which caused her to request assistance in effectuating a traffic stop.[5]  Detective Matos explained that, once she witnessed the traffic violation, she informed Sergeant Kelly of the traffic violation via her cell phone, and only later addressed her unit over the TAC-1 channel.  (Jan. 11, 2008 Suppression Hr'g, at 7:21-9:3.)  Detective Matos testified that it was not particularly unusual for officers to communicate via their cell phones when feasible, in order to avoid the interception of communications which often occurs with radio transmissions.  (Id.)  Castro contends, essentially, that this hindsight explanation is too convenient and argues that the Court should give little weight to this testimony and, instead, focus on the TAC-1 tape which reveals no basis for the traffic stop.  As discussed below, Castro raises a valid concern, but overlooks key testimony.

The Court does find the absence of a description of the traffic violation on the TAC-1 tape to be troubling.  It seems reasonable to expect police officers to use proper, monitored channels of communication, as opposed to private cellphones, when engaged in their law enforcement duties – particularly when planning searches, seizures, and other activities that reasonably may be expected to raise constitutional questions.  Castro is right to question the practice of communicating official police business via cellphone.  It could, perhaps, create the impression that the conversation is, for some reason, one that officers do not want recorded.  Though Detective Matos explained that officers occasionally communicated via cellphone because police channels could be monitored by people other than law enforcement, the explanation was cursory and failed to discuss CPD policy on the issue, or to indentify a specific risk in relation to the Castro investigation.  In many instances, the Court would find Detective Matos's explanation inadequate to overcome the doubt raised by such practices.  Under

---

[5]  This admission was particularly candid, and further supports the Court's conclusion that Detective Matos's testimony regarding her observations of a traffic violation and communication of that observation to Sergeant Kelly, was credible.

the circumstances of this case, however, the Court does not find that the informal communications between Detective Matos and the other officers in her unit raise sufficient doubt to find that Sergeant Kelly lacked probable cause to stop the vehicle.

Here, there is a plausible and credible explanation for the differences between the TAC-1 tape and the testimony of Detective Matos.  As an initial matter, the Court observes that the TAC-1 tape does not *contradict* Detective Matos's testimony with respect to the traffic violation.  Instead, reference to the traffic violation merely is absent from the TAC-1 tape.  Though Detective Matos testified that she informed her unit of the traffic violation, she did not claim that she did so over the TAC-1 tape.  During the reconvened hearing, she elaborated that she informed the other officers via her cellphone, explaining why the communication relating to the traffic violation is absent from the TAC-1 tape.

The TAC-1 tape, moreover, begins with Detective Matos's pursuit of Castro's vehicle, and there are no unexplained gaps in the tape.  Thus, it is not as though Detective Matos claimed that she began communicating over the TAC-1 channel, then used her cellphone, and then went back to the TAC-1 channel.  The chronology of events described by Detective Matos does not appear to be particularly unusual.  Detective Matos's testimony that she was conversing with Sergeant Kelly over her cellphone while she was surveilling Castro's residence and was in a stationary position, then she changed to the TAC-1 channel once she was moving in pursuit of Castro offers a plausible explanation for why the TAC-1 tape begins with the pursuit of Castro's vehicle.

Most critically, and contrary to Castro's assertion, Detective Matos's testimony was not the only evidence that Sergeant Kelly was advised of the traffic violation prior to the traffic stop.  Rather,

Sergeant Kelly, whose testimony the Court found particularly credible,[6] also testified under oath that Detective Matos informed him of the traffic violation before he pulled Castro's vehicle over.  In short, while the TAC-1 tape does not support Detective Matos's testimony relating to the traffic stop, it does not directly contradict that testimony.  Additionally, Sergeant Kelly credibly testified that he was informed personally – by Detective Matos – of the traffic violation prior to initiating the traffic stop of Castro's vehicle.  Thus, while the circumstances indicate that CPD officers also had an ulterior motive for stopping Castro's vehicle, given the testimony of Detective Matos and Sergeant Kelly (and despite the TAC-1 tape), the Court finds that they had probable cause to do so.  See Wren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

### B.  The Initial Warrantless Search of Castro's Residence Was Improper.

Castro's second challenge relates to the search of his residence conducted by CPD officers after his arrest, but prior to securing a warrant.  Several key points relating to this search bear reiteration.  Sergeant Kelly testified that he knocked on the back door of the residence, and a woman who identified herself as Castro's mother answered the door.  At this time, the officers had their weapons drawn and Sergeant Kelly testified that he told Castro's mother that the officers were there in connection with a drug investigation.  According to Sergeant Kelly, Castro's mother "allowed [them] to come in," to the kitchen, which was off the back porch, but Sergeant Kelly admitted that he "honestly d[id] not remember the conversation."  (Nov. 29, 2007 Suppression Hr'g, at 43:9-44:6.) Upon entering the home, Sergeant Kelly spotted a food scale on the kitchen table, and asked Castro's

---

[6]  As discussed below, despite potentially jeopardizing the legitimacy of his initial entry into Castro's residence, Sergeant Kelly candidly testified that he did not recall details of his conversation with Castro's mother.

mother if there were any other occupants in the house;[7] Castro's mother told Sergeant Kelly that there were not.  Sergeant Kelly and other officers then conducted a "protective sweep" to ensure there were no other occupants in the home and to prevent the destruction of evidence.  Sergeant Kelly admitted that he did not ask Castro's mother to consent to this protective search.  As noted above, the protective sweep revealed a firearm.

The government bears the burden to prove that the warrantless entry into Castro's residence was consensual.  United States v. Henry, 429 F.3d 603, 618 (6th Cir. 2005).  Simply stated, Sergeant Kelly's candid testimony, wherein he admits that he did not recall what Castro's mother said to him, does not satisfy the government's burden.  While it is clear from the testimony that Castro's mother did not impede or resist the officers' entry, to say that she consented to their entry would be entirely speculative.  Further, as defense counsel points out, prior to entering the home, the TAC-1 tape reveals officers stating that they are going to pull up to the home and they are going to go in; there is no discussion of seeking the consent of the occupants.  (Jan. 11, 2008 Suppression Hr'g, CD Recording of TAC-1 Channel, Def.'s Supplemental Ex. 1.)  Further, Sergeant Kelly admitted that several officers approached the back door with their weapons already drawn.  The aggressive posture of the officers, when considering the totality of the circumstances and the dearth of specific details, further militates against a finding that the police intended to obtain or, indeed, actually received consent to enter the residence.  Given the absence of definitive testimony relating to the consent from Sergeant Kelly, and the surrounding circumstances, therefore, the Court finds that the warrantless search of Castro's residence was improper.  The impropriety of this search, however, does not impact the admissibility of evidence discovered during the execution of the search warrant.  Segura v. United States, 468 U.S.

---

[7]     At the time the question was posed, Castro's sister was also in the kitchen, within sight of the officers.

796 (1984).  It does, however, impact the strength of the affidavit used to secure the search warrant because the food scale was discovered and added to the affidavit as a result of the warrantless search. The reference to that scale in the affidavit must be stricken, and sufficiency of the probable cause to support the warrant must be examined without it.

      **C.**    **The Search Warrant Was Supported By Probable Cause.**

Castro argues that the affidavit supporting the search warrant must be stripped of two improper assertions and that, when those assertions are removed, the search warrant is not supported by probable cause.  Specifically, Castro contends that any reference to the food scales discovered on the kitchen table must be stricken because they are the fruits of the improper protective sweep, and that the use of the term "confidential informant," in the affidavit supporting the search warrant, was misleading.

      **1.**    **Information Gained from the Protective Sweep.**

As noted above, the information gained from the "protective sweep" of the residence, specifically the presence of the food scale, resulted from an improper search and should not have been incorporated into the warrant.  The government's argument that the search was a valid protective sweep is unavailing.  The Court finds no merit to the suggestion that law enforcement officers may arrest a suspect, choose to drive to his home, enter without consent, and then, once inside, conduct a brief search to ensure their safety.  See Vale v. Louisiana, 399 U.S. 30, 33 (1970).  A bald claim that the search was, in part, to prevent the spoliation of evidence will not suffice to demonstrate the exigent circumstances required to perform a warrantless search.  Segura v. United States, 468 U.S. 796, 812 (1984) (upholding the validity of a search where officers had information relating to additional quantities of illegal drugs within the premises, but stating "officers who have probable cause and who

12

are in the process of obtaining a warrant have no reason to enter the premises before the warrant issues, absent exigent circumstances which, of course, would justify the entry.").  To permit the actions undertaken here would, in virtually every instance, obviate the need to secure a warrant to search a suspect's residence any time he or she was lawfully arrested elsewhere.

### 2.    Reference to the Term "Confidential Informant."

Castro also argues that the reference to a confidential informant is recklessly misleading and must be omitted from the probable cause analysis.  As explained below, the Court agrees as to the misleading nature of the reference, but finds that completely striking the information relating to the CI is not the proper remedy.

At the suppression hearing, Detective Matos testified that she did not know the identity of the person who first, and repeatedly, informed her that Castro was selling narcotics out of his residence.  (Nov. 29, 2007 Suppression Hr'g, at 24:23-28:10.)  The affidavit in support of the search warrant, however, refers to the source of Detective Matos's information as a "confidential informant." Castro argues that the use of the term confidential informant is misleading because it conveys the impression that the informant is known to the police and, perhaps, that the informant regularly provides law enforcement officers with information.  Indeed, discussing the difference between an anonymous tipster and a confidential informant, the Sixth Circuit stated: "the distinction is relevant whenever tips are at issue in a warrant application.  It should be readily familiar to police officers, so disregarding it suggests recklessness."  United States v. Elkins, 300 F.3d 638, 651 (6th Cir. 2002). According to the Sixth Circuit, it is appropriate for a Court to strike a portion of the affidavit that erroneously describes a tipster as a confidential informant.  It is not necessary, however, to remove all reference to the tip from the affidavit.  Id.  Instead, the affidavit may be examined as though the tip

came from an anonymous informant.  Id.  The tip, therefore, still warrants consideration, albeit of a somewhat different nature, in the context of the Court's analysis of the totality of the circumstances.

### 3.     The Remainder of the Detective Matos's Affidavit Provided Probable Cause to Issue the Search Warrant for Castro's Residence

A search warrant may not issue absent probable cause, "supported by Oath or affirmation." U.S. Const. amend. IV.  "Probable cause is 'a fair probability that contraband or evidence of a crime will be found in a particular place.'"  Illinois v. Gates, 462 U.S. 213, 238 (1983).  "A judicial officer presented with a request for a search warrant must consider the totality of the circumstances and make a 'practical, commonsense' determination whether probable cause exists."  Id.  The affidavit supporting a search warrant must present, "a nexus between the place to be searched and the evidence sought."  United States v. Laughton, 409 F.3d 744, 747 (6th Cir.2005) (citations omitted).  "This nexus may be established by the nature of the items and normal inferences of where a person would keep such items."  United States v. Yarbrough, No. 06 cr 2233, Slip op., 2007 WL 4553687, at *3 (6th Cir. Dec. 20, 2007).  "The determination by the issuing judicial officer is entitled to great deference by the reviewing court and should be scrutinized in a realistic and common sense manner."  United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996) (internal quotations deleted).  When reviewing the sufficiency of the evidence supporting a finding of probable cause, the Court is "limited to the information presented in the four corners of the affidavit."  United States v. Jackson, 470 F.3d 299, 306 (6th Cir. 2006).

After excising and modifying the improper portions of Detective Matos's affidavit, as discussed above, the affidavit, in summary, contains the following relevant averments:

1. Detective Matos's is a law enforcement officer with substantial training and experience.

14

2. Through a utilities check, Detective Matos determined that Castro (and his wife) were both associated with the 2180 W. 83rd street address.

3. That an anonymous informant provided Matos with a tip describing Castro and stating that Castro (and his wife) were selling heroin from 2180 W. 83rd street.

4. That Detective Matos, on several occasions, set up surveillance on Castro's residence and observed heavy traffic in and out of the residence for short periods of time that, through her experience and training, Detective Matos surmised were deliveries of narcotics.

5. That law enforcement officers conducted a legal traffic stop on Castro's vehicle soon after he departed from the residence and found heroin on Castro's person, and a large quantity of cash and a bag of suspected heroin in the vehicle.

6. That Castro had an extensive criminal history and was on parole.

7. That once heroin was found on Castro's person, he stated "I'm done, I'm on parole it makes no difference now."

(See Nov. 29, 2007 Suppression Hr'g, Pl.'s Ex. 2, Matos Affidavit.)

Because the Court has concluded that the officers had probable cause to initiate the traffic stop that resulted in much of the information described in the affidavit, the question remaining for the Court is whether the statements listed above, "establish a sufficient nexus between [Castro's] illegal activity and his residence to allow a search of that residence." United States v. Gunter, No. 07-5271, slip op., 2008 WL 482031, *3 (6th Cir. Feb. 20, 2008) (citing United States v. Frazier, 423 F.3d 526, 532 (6th Cir.2005)).  "To establish such a nexus, a warrant application must show more than just that 'the owner of the property is suspected of crime,' but instead must establish 'that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to

which entry is sought.'"  <u>Gunter</u>, 2008 WL 482031, *3 (quoting <u>Zurcher v. Stanford Daily</u>, 436 U.S. 547, 556 (1978)).  "The mere fact that someone is a drug dealer is not alone sufficient to establish probable cause to search their home."  <u>Id.</u> (citing <u>Frazier</u>, 423 F.3d at 533).  Instead, law enforcement officers must provide additional facts that, when considered in the totality of the circumstances, provide some reliable evidence connecting Castro's criminal activity to his residence.

In <u>United States v. McPhearson</u>, 469 F.3d 518 (6th Cir. 2006), the Sixth Circuit affirmed a district court's suppression of evidence discovered during a search of a defendant's residence after a pat-down on the porch of that residence uncovered crack on the defendant's person.  The Sixth Circuit found that the government's argument depended "on an inference that an individual arrested outside his residence with drugs in his pocket is likely to have stored drugs and related paraphernalia in that same residence."  <u>Id.</u> at 524.  Citing to <u>United States v. Miggins</u>, 302 F.3d 384 (6th Cir. 2002) and the numerous cases referenced therein, the Sixth Circuit found that the "inference can be drawn permissibly in some cases," but only if, "the affidavits contained an additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes – namely, the *independently corroborated fact* that the defendants were known drug dealers at the time the police sought to search their homes."  <u>Id.</u> (emphasis added).  Thus, if "a warrant affidavit is based on the unsubstantiated testimony of confidential informants, the defendant's drug dealer status alone does not establish probable cause [citing <u>Frazier</u>] . . . .  [a finding of probable cause] merely requires that the information in the warrant be provided by sources whose reliability is apparent in the affidavit itself."  <u>United States v. Bethal</u>, 245 Fed. Appx. 460, 467 (comparing <u>Frazier</u>'s holding to the holding in <u>Miggins</u>).  The Sixth Circuit's holdings in <u>Frazier</u> and <u>McPhearson</u>, therefore leave, "undisturbed the rule from <u>Newton</u>, that the fact that a defendant who is a drug dealer with 'continual

and ongoing operations' in and of itself creates probable cause to search his home." Id. (citing United States v. Newton, 389 F.3d 631 (6th Cir. 2004), vacated on other grounds, 546 U.S. 803, (2005)).

In sum, to establish probable cause to search the residence of a defendant, the Sixth Circuit requires either: (1) substantiated, reliable testimony that the defendant is a drug dealer with "continual and ongoing operations;" see Bethal, 245 Fed. Appx. at 467; Newton, 389 F.3d at 635-36; Miggins, 302 F.3d at 393-94, or (2) an affidavit containing "an additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes" Gunter, 2008 WL 482031, at *4; see also Caicedo, 85 F.3d at 1193.[8] Here, as explained below, the Court finds that the affidavit contains both substantiated testimony that Castro is a drug dealer with continual and ongoing operations, *and* additional facts that supply a nexus between Castro's residence and his known criminal activity.

a.          **Castro's Status as a Drug Dealer with Continual and Ongoing Operations Was Verified.**

Though the affidavit here does not reference a controlled buy, or include the testimony of a known, reliable confidential informant to establish that Castro is a drug dealer (as is often the case, see, e.g., Miggins, 302 F.3d at 393-94; Gunter, 2008 WL 482031, at *2), the Court believes that it contains sufficient facts to warrant the inference that Castro is a drug dealer with continuing operations. Importantly, the affidavit states that Castro has an "extensive criminal history and is currently on parole." Notably, however, the affidavit is silent as to the nature of his criminal history – a critical

---

[8]      For clarity's sake, it is important to understand that there is substantial overlap between these requirements. This is primarily because, in some instances, the "additional fact" that permits a magistrate to infer that evidence would be found at a defendant's home may some type of verification that he is a drug dealer with continual and ongoing operations emanating from that home. See, e.g., Miggins, 302 F.3d at 393-94; Newton, 389 F.3d at 636.

17

omission.  In McPhearson, the Sixth Circuit took note that "McPhearson was not a known drug dealer: his prior convictions were for property crimes, and the warrant on which the police arrested him was for simple assault," finding "[i]n the absence of any facts connecting McPhearson to drug trafficking, the affidavit in this case cannot support the inference that evidence of wrongdoing would be found in McPhearson's home because drugs were found on his person."  Here, however, the affidavit includes additional averments, in addition to the generalized reference to a criminal history, that support the inference that Castro was a drug dealer who kept evidence of his crimes at his residence.

Like the defendant in McPhearson, Castro was arrested with drugs on his person.  Unlike McPhearson, however, Castro was also travelling in a car which, according to the affidavit, contained "a large quantity of cash and a bag of suspected heroin" in plain view.  Though, as the defendant points out, the quantity of suspected heroin and the amount of cash were unspecified, the affidavit made clear that, at a minimum, there were multiple caches of heroin and a "large" quantity of cash.  The Court finds that the presence of substantial cash and additional heroin found in the vehicle in which Castro was travelling are more indicative of a plan to distribute or "deal" drugs than McPhearson's possession of a single quantity of drugs on his person, while at his home.  See United States v. Collier, 246 Fed.Appx. 321, 329-30 (6th Cir. 2007) (finding that circumstantial evidence including a large quantity of cash and multiple quantities of illegal drugs supports a finding that a defendant was actively engaged in the sale of illegal drugs).

Additionally, here the affidavit in support of the warrant recounts a tip from an informant who explained that Castro was selling heroin out of his residence – the officers in McPhearson received no such tip.  This tip serves two important purposes: (1) it reinforces Castro's status as a drug dealer with ongoing operations who may conceal evidence of his crimes at his home; and (2), as

18

discussed below, it supplies the nexus between Castro's observed criminal activity (his possession of narcotics as discovered during the traffic stop) and the residence to be searched. The tip, moreover, was provided to a law enforcement officer who conducted surveillance to ascertain its veracity. Thus, given the tip (including some vetting of it by an experienced law enforcement officer) and Castro's arrest while in possession, or in the vicinity, of multiple quantities of suspected heroin and a large quantity of cash, the inference that Castro was a drug dealer with ongoing operations, who is likely to retain evidence at his home, is eminently more reasonable here than in McPhearson.

> **b.** **The Affidavit Supplied a Nexus Between Castro's Illegal Activities and His Residence.**

As discussed above, the search of a defendant's residence is also permissible where the affidavit provides a nexus connecting the defendant's criminal activities and his residence. A review of recent Sixth Circuit precedent, however, reveals that, in the case of drug dealers, only a minimal connection must be shown.

In Miggins, the Sixth Circuit found that there was a sufficient nexus between the address where cocaine was delivered to Miggins and Miggins's residence. The Sixth Circuit focused on three considerations in deciding that the affidavit provided probable cause: (1) that Miggins had been convicted of a drug-related offense; (2) that Miggins, who provided an assumed name when accepting the delivery of a package of cocaine, was in possession of a paper containing the assumed names of the sender and recipient of the package; and (3) that, in the case of drug dealers, evidence is likely to be found at their residences. United States v. Miggins, 302 F.3d 384, 393-94 (citing to ten cases concluding that drug dealers often possess evidence in their residences). Thus, the only facts that appeared to enter the Court's consideration beyond Miggins's status as a drug dealer were his untruthfulness with law enforcement officers, and his possession of the assumed names of his co-

conspirators.  These facts, however, seem to provide little to connect the defendant's crimes to his *residence*.  In fact, it has been suggested that Miggins and Newton, may stand for the proposition that a defendant's status as a drug dealer, if sufficiently, independently corroborated, may be sufficient to establish probable cause.  See McPhearson, 469 F.3d at 525 n.3 (6th Cir. 2006) (citing to Frazier and Miggins, noting that allegations of drug dealing "based on information from an untested confidential informant is insufficient to establish probable cause to search the alleged drug dealer's home.  However, where the allegation of drug dealing is coupled with independently corroborated information from police officers, it may be sufficient to establish probable cause."); United States v. Newton, 389 F.3d 631 (6th Cir. 2004), vacated on other grounds, 546 U.S. 803, (2005) (finding that the fact that a defendant is a drug dealer with "continuing and ongoing operations" in and of itself creates probable cause to search his home.).  Assuming, however, that reference to Miggins's evasive behavior provided a connection to his residence (perhaps, as in Caicedo, indicating that he had something to hide) it is, at best, a minimal connection.

In Caicedo, the Sixth Circuit "upheld a warrant authorizing a search of a residence despite only a limited connection between the residence and drug related activity." Gunter, 2008 WL 482031, at *4 (citing Caicedo, 85 F.3d at 1193).  The defendant in Caicedo, who was arrested while traveling with a friend who was carrying 565 grams of cocaine in his backpack, lied about his address.  Caicedo, 85 F.3d at 1193.  An experienced narcotics officer's affidavit stated that the reason for the defendant's lie could have been that further evidence was located at his residence.  Id.  Assigning considerable weight to the judgment of the experienced narcotics officer, and noting the quantity of the narcotics seized, the Sixth Circuit concluded that, "it was reasonable to defer to the attesting officer's expertise

and that the affidavit adequately established probable cause to search [the residence.]" under the totality of the circumstances.  Id.

More recently, in Gunter, the Sixth Circuit revisited instances where affidavits permitted a magistrate to draw the inference that evidence would be found in a defendant's home, and where those facts did not.  The Gunter court turned to three cases analyzing the information available in an affidavit in support of a warrant application: Frazier, Miggins, and Caicedo.  In its examination of Frazier, the Sixth Circuit observed that the affidavit contained no corroboration of an informant's statement that the defendant was selling drugs from his home.  Gunter, 2008 WL 482031, *3.  The Court reiterated its finding that an affidavit "based almost exclusively on the uncorroborated testimony of unproven confidential informants" is "insufficient to tie the alleged criminal activity to the defendant's residence."  Id. (citing Frazier, 423 F.3d at 533).  The Gunter Court, however, distinguished Frazier from Miggins and Caicedo, noting that, in the latter cases, the Sixth Circuit upheld searches of drug dealers' residences even though police observed no illegal activity at the residences.  Considering the three cases together, the Sixth Circuit, in Gunter, found that its precedents establish that, "a nexus exists between a known drug dealer's criminal activity and the dealer's residence when *some reliable evidence* exists connecting the criminal activity with the residence," but if "the only evidence of a connection between illegal activity and the residence is unreliable, such as uncorroborated statements by a confidential informant, then a warrant may not issue allowing the search of the residence." Gunter, 2008 WL 482031, *4 (internal citations omitted) (emphasis added).

In Gunter, as in Caicedo, the Sixth Circuit allocated substantial weight to the judgment of an experienced officer's belief that drug dealers typically keep evidence of their crime in their residence.  The Court distinguished the affidavit at issue from the affidavit in Frazier, stating that,

21

"unlike Frazier, where the warrant affidavit relied entirely on statements of confidential informants to establish a connection between the defendant and his residence, the instant affidavit describes an incident where law enforcement agents observed Defendant visiting his residence right before he traveled to the site of a drug sale." Gunter, 2008 WL 482031, at *4.  The Sixth Circuit found that the additional fact of the visit, "provided a neutral magistrate with a substantial basis to conclude that Defendant may have stopped at his residence to pick up some of his merchandise before meeting his customer at another location." Id.  The Court concluded that the evidence, "combined with the affiant's statements that he has significant experience in narcotics investigations, is sufficient to establish a nexus between Defendant's illegal activities and his residence." Gunter, 2008 WL 482031, at *4.  Here, the Court finds that "some reliable evidence" connecting the criminal activity with the residence to be searched exists.

It is true that an unverified tip from an unidentified tipster cannot support a finding of reasonable suspicion, much less probable cause.  See Florida v. J.L., 529 U.S. 266, 271-72 (2000). Rather, in order "to receive a high level of consideration, allegations from an anonymous tipster must demonstrate veracity, reliability, and a sound basis for knowledge." United States v. Helton, 314 F.3d 812, 820 (6th Cir. 2003) (citing J.L., 529 U.S. at 271-72).  Castro attempts to minimize the importance of the anonymous tip at issue by claiming that it was improperly described as coming from a confidential informant and, thus, that it did not provide probable cause to search Castro's residence. The anonymous tip received by Detective Matos, however, did receive some level of corroboration, indicative of veracity and reliability.  The essence of the tip was that Castro and his wife were dealing heroin from Castro's residence.  The affidavit states that Detective Matos confirmed that Castro and his wife were indeed residents of the home that was the subject of the tips.  The affidavit further states

22

that, during multiple surveillance sessions, Detective Matos observed heavy traffic in and out of the residence as well as the defendant leaving for short periods of time that, in her experience as a law enforcement officer, she believed involved the sale and delivery of narcotics. While the it may be true that the corroboration here did not reach a level at which the tip, standing alone, could have provided probable cause to search the residence, see Alabama v. White, 496 U.S. 325, 330-32 (1990), the Court will not minimize the observations of an experienced law enforcement officer who determines that the activities under surveillance are consistent with the criminal conduct described in the tip.[9] Thus, though the tip was anonymous, given the partially corroborative effects of Detective Matos's investigation, the tip was not without value, and it warrants inclusion in the Court's consideration of the totality of the circumstances.

It is also noteworthy, moreover, that Detective Matos's affidavit explains that, prior to his arrest, Castro had just left the residence to be searched. See, e.g., Gunter, 2008 WL 482031, at *4 (noting, "the instant affidavit describes an incident where law enforcement agents observed Defendant visiting his residence right before he traveled to the site of a drug sale;" reasoning that the "visit provided a neutral magistrate with a substantial basis to conclude that Defendant may have stopped at his residence to pick up some of his merchandise before meeting his customer at another location.")

Finally, as noted above, "a judicial officer may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found" United States v. Lawson, 999 F.2d 985, 987 (6th Cir. 1993). Here, Detective Matos described her

---

[9]  See Frazier, 423 F.3d at 532 ("While independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause, . . . in the absence of any indicia of the informant's reliability, courts insist that the affidavit contain substantial independent police corroboration.")

extensive training and experience with narcotics investigations. Detective Matos's affidavit explains that after receiving the tip, her subsequent surveillance of Castro's residence – over the course of four months – led her to conclude that Castro and his wife were dealing heroin from the residence. The affidavit further explains, at length, that in Detective Matos's experience, persons who traffic in illegal drugs frequently retain evidence of their crimes at their residences. A law enforcement officer's articulation of his belief that drug dealers often keep evidence at their residences is a key consideration in the totality of the circumstances and its importance cannot be overlooked. See Gunter, 2008 WL 482031, *4 ("The warrant affidavit described the investigating law enforcement agent's significant experience in narcotics investigations – including over 100 investigations into drug trafficking – and stated that in that agent's experience drug dealers typically keep evidence of their crime in their residence."); Caicedo, 85 F.3d at 1193 ("The affidavit also attested to the fact that from [the officer's] experience, 'many drug traffickers utilize their homes to conduct their illegal narcotics trafficking activities . . . .,' and it listed several items drug traffickers were likely to keep at their residences.").

Though the Court has undertaken to demonstrate that the affidavit at issue articulates a nexus between Castro's criminal activities *and* serves to illuminate Castro's status as a drug dealer with ongoing operations, it is important to put these findings in the proper context. To facilitate its analysis of the affidavit in support of the warrant, the Court found it useful to review recent Sixth Circuit precedent in which a defendant has challenged the nexus between his arrest and the search of his residence or his status as a drug dealer. The relevant analysis, however, does not necessarily turn on establishing, as a matter of certainty, either a nexus between the defendant's conduct and his residence or the defendant's status as a drug dealer. United States v. Woosley, 361 F.3d 924, 926 (6th Cir. 2004)

24

("The affidavit should be reviewed in a commonsense – rather than a hypertechnical-manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny."); United States v. Davidson, 936 F.2d 856 (6th Cir. 1991).  Instead, the degree to which each factor is shown merits inclusion in the Court's consideration of the totality of the circumstances incident to the search.

After a commonsense review to the affidavit, affording great deference to the magistrate's determination – as the Court must – the Court does not find that the magistrate arbitrarily exercised his discretion in this instance.  See id.  In sum, the Court finds that, when Castro's criminal record, his arrest while possessing multiple quantities of narcotics and cash after just having departed from the residence, his exclamation of "I'm done, I'm on parole it makes no difference now," the anonymous partially corroborated tip that Castro was selling heroin from his residence, Detective Matos's law enforcement experience and surveillance of the residence, are all considered, probable cause existed to support the issuance and execution of a warrant for the search of Castro's residence.

## III.    CONCLUSION.

While the Court agrees with some of Castro's contentions with respect to the certain facts included within the search warrant, as discussed above, the Court finds that the modified warrant was supported by probable cause.  Accordingly, Defendant's *Motion to Suppress Evidence* (Doc. 15) is **DENIED**.

IT IS SO ORDERED.

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
Dated: May 7, 2008                    **UNITED STATES DISTRICT JUDGE**